This case assigned to District Judge _Wilson_
and to Magistrate Judge _Deere_

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**JUL 29 2010**

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### JONESBORO DIVISION

CASE NO.    **3·10-CV-0171**

Tony Bradley; Ray E. Vester; GC Farms Partnership; Angie Walker; Aro-Lee Farms Inc.; Bailey & Lingo Farm, Inc.; Barbara Rice; BKS Farms; Blake Bradley Farms; Bransford Farming Company; Bryan Hutson Farms; Bryan R. Felty; Carey Rice; Charles Reeves; Crossruff Farms Partnership; D&E Mitchell Farms; Danny Rice; E & J Partnership; E & M Farms; Earl Vester Trust; F and R Turner Farms LLC; Fields Farms Partnership; Floyd Turner; Fred Lingo; G.W.J. Farm Inc.; Gary & Linda Walker Farms; Gary Johnson Farm Inc.; Gilbert Palmer Farms; Goodman Farms Joint Venture; Hugh H. Frisby, Jr.; Jack Jackson & Sons Partnership; James C. Rice; James G. Buffington; John L. Felty; Johnny T. Larkan; Johnson & Holt Inc.; L.D. & Tracy Vaughn Farm Inc.; L.D. Vaughn; L.D. Vaughn Farms Inc.; Larkan Family Limited Partnership; Leah J. Walker; Longneck, Inc.; Mann Brothers; Mark Fields Farm; Matthew Knight Farms; Mildred H. Vester; N-W Farm Properties, LLC; Palmer Farms Partnership; Palmer Planting Company; Patsy Hottel Farms; Patterson Farms; Prince Farm; RDR Farms; Reeves Brothers; Rice Farms Partnership; Roger Turner; Russell Altom; South 7-11 Partnership; Stacey Rice; Strohl Farms; Sunshine Farms; Talmage & Talmage Farms; Thomas Beene Farms, Inc.; TLB Farms Inc.; Tommy & Lauren Fields Farm; Tracy Vaughn; Turner Farms IV Partnership; Vester Farms Inc.; Wade Falwell; Wade Walker; Williams Farming Co.; Young's Farms Inc.; A. Wyckliff Nisbet, Jr.; Aaron Blake Bradley; Albert Mann; Amy L. Foster Revocable Trust Fund; Getson Farms; Thomas Alvin Rice Jr.; Susan Tamara Kirkland; Ramona Jo Marsom; Emma Gaye Rice; Andy Boone; Angela Coe; Otto Reynolds; Joe Coe; Louise Taylor; Lowell Nance; Lois Nance; Al Young; Angie Walker; Anita Pugh; Garner Land Co. LLC; Anna Belle Patterson; Barbara Rice; Bart Sollars; Bart Sollars Farms; D&S Farms; Kay Eldridge; Barton Eldridge; Dan Eldridge Farm; Beth Fields; Mark Fields; Jernigan Partners; William C. Young Estate; Newton Hammond; Blake Goodman; Kenneth Richardson; Carlos Goodman; Maizel Baxley; Eula Watson; James Higgins; Linda Johnson; Brenda M. Prince; Bryan Hutson; Bryan R. Felty; Carey Rice; Carolyn McCrary; McCrary Farms, Inc.; Charles Reeves; Cotham & Jackson Farms; Elizabeth Hesser; Whiting Farms LLC; Dallas Roberts; Danny Rice; Debra Falwell; Donnie Mitchell; E & L Farms Partnership; J.E. Vaughn; Rupert White; Wanda Lee Vaughn; Monnie T. Osowski;

1

Eddie Blagg; Emmadell McCrary; Floyd E. Turner Estate; Floyd Turner; Fred
Lingo; Gary Coles; Gary W. Johnson; Gary Walker; Gilbert Palmer III; Godfrey
Thomas Farms Partnership; Girerd Brothers; Heath Williams; Howard Strohl;
Rickey Strohl; Hugh Frisby, Jr.; Jack Jackson; Jackie C. Prince; James C. Rice;
James G. Buffington; James Lee Miller; Kings Minnow Farm Inc.; James Stacey
Rice; James Thomas Butler; James Thomas Butler II; Jan Johnson; Jerry
Goodman; Jim Mann; Joe Corey Patterson; Johnny T. Larkan; Joy Strohl; Joyce
Reeves; Joyce Reeves; Jeff Reeves; Joyce Jean Johnson; Tipp Farm LLC; Ed
Pringer; BullTown Farm, Inc.; Robert H. McDonald; Ran McDonald; Dola Lemay;
Roger Smith; John W. Armstrong; Kevin Wade Falwell; Kim Sollars; Kristie
Williams; L.D. Vaughn; Leah Walker; Livesay Farm; M.D. Thompson & Son;
Mable Wilhite; Boone Farms Inc.; Mark Fields; Martha McKnight; Walker
Revocable Trust; James Shoemaker; Robert C. Shoemaker; Velma J. Sanderson;
Mavis Elrod; Wilson Enterprises; Robert A. Linn; Robert William Buckles;
Sammy W. Walker; Matthew Knight; McClure & Hardin Partners; Patsy Ann
Hottel; Patty M. Felty; Richard Bransford; Robin Roberts; Roger Turner; Russell
Altom; Section 13 Farms; Joyce Jean Johnson; South 7-11 Partnership; Talmage J.
Whitehead; Thelma Hutchens; Charles Hutchens; Fred Klanke; Thomas Beene;
Thomas Turner; Tom Fields; Tommy Fields; Tracy Vaughn; Wade Falwell; Wade
Walker; James Brothers; K & J Farms, Inc.; Jerry James; Kenny James; Northcutt
Farming Company; Travis Northcutt; Barbara Northcutt; JBJ Farming Partnership;
Johnny Smith; Floyd Shields; Barbara Smith; Larry Schafer; Toll Farms
Partnership; George Toll; Steve A. Chlapecka; Steve Chlapecka, Jr.; LaGrue Land
& Irrigation Company; V.O. Calhoun, Jr.; Dorris Greenwalt, L and M Farms;
Lance Hill; G & N Farms Partnership; Charles D. Nisbett; Duane C. Nisbett; Mary
Louise Nisbett; Chad Nisbett Farms; Triangle Farms Inc.; A & D Farms, Inc.;
Andrea S. Hecht; Chad Bennett; Brea Ann Bennett; Chad Bennett Farms; Rodger
Patterson; Plato, Inc.; AD Patterson, LLC; Bobby Bell; Bell Family Limited
Partnership; Jerry Bell; Mark Bell; Mark & Kimberly Bell Farm; Kimberly Bell;
Marjorie Bell Hill; William F. Jones; Frank & Debbie Jones Farm; Debbie Jones;
Mary Tallent; Becky Tallent; James Tallent; Franklin Tallent; James H. Freese;
Crossroads Farm; Mike Burkett; M & C Farms; Ruth E. Smith, Kathy Ann
Hughes; Charles A. Clayton, Susan Clayton; J.R. Foot, Jr., Alice R. Foot;
Benjamin Foot; Foot Farms, LLC; R &F Farms, LLC; Kenneth W. Foot; JBK
Farms, Inc.;  Rita Foot;  Verser Farms, Inc.;  Joe Verser;  Joe Mencer; Joe Mencer
Farm; Charles Mencer Farm;  Charles Mencer, WLMCO, Inc.; M&W Planting
Company, Inc.;  and B&B Mencer Farm;

PLAINTIFFS,

VS.

BAYER CROPSCIENCE LP;
BAYER CROPSCIENCE HOLDING, INC.;
BAYER CROPSCIENCE, LLC;
BAYER CROPSCIENCE AG, a German
Corporation; BAYER AG, a German Corporation; BAYER
BIOSCIENCE NV, a Belgian Corporation,

DEFENDANTS.

JURY TRIAL DEMANDED

## **COMPLAINT**

Come Now the Plaintiffs in the above-styled Complaint and allege as follows:

1.    Plaintiffs Ray E. Vester; GC Farms Partnership; Angie Walker; Aro-Lee Farms Inc.; Bailey & Lingo Farm, Inc.; Barbara Rice; BKS Farms; Blake Bradley Farms; Bransford Farming Company; Bryan Hutson Farms; Bryan R. Felty; Carey Rice; Charles Reeves; Crossruff Farms Partnership; D&E Mitchell Farms; Danny Rice; E & J Partnership; E & M Farms; Earl Vester Trust; F and R Turner Farms LLC; Fields Farms Partnership; Floyd Turner; Fred Lingo; G.W.J. Farm Inc.; Gary & Linda Walker Farms; Gary Johnson Farm Inc.; Gilbert Palmer Farms; Goodman Farms Joint Venture; Hugh H. Frisby, Jr.; Jack Jackson & Sons

Partnership; James C. Rice; James G. Buffington; John L. Felty; Johnny T. Larkan; Johnson & Holt Inc.; L.D. & Tracy Vaughn Farm Inc.; L.D. Vaughn; L.D. Vaughn Farms Inc.; Larkan Family Limited Partnership; Leah J. Walker; Longneck, Inc.; Mann Brothers; Mark Fields Farm; Matthew Knight Farms; Mildred H. Vester; N-W Farm Properties, LLC; Palmer Farms Partnership; Palmer Planting Company; Patsy Hottel Farms; Patterson Farms; Prince Farm; RDR Farms; Reeves Brothers; Rice Farms Partnership; Roger Turner; Russell Altom; South 7-11 Partnership; Stacey Rice; Strohl Farms; Sunshine Farms; Talmage & Talmage Farms; Thomas Beene Farms, Inc.; TLB Farms Inc.; Tommy & Lauren Fields Farm; Tracy Vaughn; Turner Farms IV Partnership; Vester Farms Inc.; Wade Falwell; Wade Walker; Williams Farming Co.; Young's Farms Inc.; A. Wyckliff Nisbet, Jr.; Aaron Blake Bradley; Albert Mann; Amy L. Foster Revocable Trust Fund; Getson Farms; Thomas Alvin Rice Jr.; Susan Tamara Kirkland; Ramona Jo Marsom; Emma Gaye Rice; Andy Boone; Angela Coe; Otto Reynolds; Otis Reynolds; Joe Coe; Louis Taylor; Lowell Nance; Lois Nance; Al Young; Angie Walker; Anita Pugh; Garner Land Co. LLC; Anna Belle Patterson; Barbara Rice; Bart Sollars; Bart Sollars Farms; D&S Farms; Kay Eldridge; Barton Eldridge; Dan Eldridge Farm; Beth Fields; Mark Fields; Jernigan Partners; William C. Young Estate; Newton Hammond; Blake Goodman; Kenneth Richardson; Carlos Goodman;

Maizel Baxley; Eula Watson; James Higgins; Linda Johnson; Brenda M. Prince;

Bryan Hutson; Bryan R. Felty; Carey Rice; Carolyn McCrary; McCrary Farms,

Inc.; Charles Reeves; Cotham & Jackson Farms; Elizabeth Hesser; Whiting Farms

LLC; Dallas Roberts; Danny Rice; Debra Falwell; Donnie Mitchell; E & L Farms

Partnership; J.E. Vaughn; Rupert White; Wanda Lee Vaughn; Monnie T. Osowski;

Eddie Blagg; Emmadell McCrary; Floyd E. Turner Estate; Floyd Turner; Fred

Lingo; Gary Coles; Gary W. Johnson; Gary Walker; Gilbert Palmer III; Godfrey

Thomas Farms Partnership; Girerd Brothers; Heath Williams; Howard Strohl;

Rickey Strohl; Hugh Frisby, Jr.; Jack Jackson; Jackie C. Prince; James C. Rice;

James G. Buffington; James Lee Miller; Kings Minnow Farm Inc.; James Stacey

Rice; James Thomas Butler; James Thomas Butler II; Jan Johnson; Jerry

Goodman; Jim Mann; Joe Corey Patterson; Johnny T. Larkan; Joy Strohl; Joyce

Reeves; Joyce Reeves; Jeff Reeves; Joyce Jean Johnson; Tipp Farm LLC; Ed

Pringer; BullTown Farm, Inc.; Robert H. McDonald; Ran McDonald; Dola Lemay;

Roger Smith; John W. Armstrong; Kevin Wade Falwell; Kim Sollars; Kristie

Williams; L.D. Vaughn; Leah Walker; Livesay Farm; M.D. Thompson & Son;

Mable Wilhite; Boone Farms Inc.; Mark Fields; Martha McKnight; Walker

Revocable Trust; James Shoemaker; Robert C. Shoemaker; Velma J. Sanderson;

Mavis Elrod; Wilson Enterprises; Robert A. Linn; Robert William Buckles;

Sammy W. Walker; Matthew Knight; McClure & Hardin Partners; Patsy Ann

Hottel; Patty M. Felty; Richard Bransford; Robin Roberts; Roger Turner; Russell

Altom; Section 13 Farms; Joyce Jean Johnson; South 7-11 Partnership; Talmage J.

Whitehead; Thelma Hutchens; Charles Hutchens; Fred Klanke; Thomas Beene;

Thomas Turner; Tom Fields; Tommy Fields; Tony Bradley; Tracy Vaughn; Wade

Falwell; Wade Walker; James Brothers; K & J Farms, Inc.; Jerry James; Kenny

James; Northcutt Farming Company; Travis Northcutt; Barbara Northcutt; JBJ

Farming Partnership; Johnny Smith; Floyd Shields; Barbara Smith; Larry Schafer;

Toll Farms Partnership; George Toll; Steve A. Chlapecka; Steve Chlapecka, Jr.;

LaGrue Land & Irrigation Company; V.O. Calhoun, Jr.; Dorris Greenwalt, L and

M Farms; Lance Hill; G & N Farms Partnership; Charles D. Nisbett; Duane C.

Nisbett; Mary Louise Nisbett; Chad Nisbett Farms; Triangle Farms Inc.; A & D

Farms, Inc.; Andrea S. Hecht; Chad Bennett; Brea Ann Bennett; Chad Bennett

Farms; Rodger Patterson; Plato, Inc.; AD Patterson, LLC; Bobby Bell; Bell Family

Limited Partnership; Jerry Bell; Mark Bell; Mark & Kimberly Bell Farm;

Kimberly Bell; Marjorie Bell Hill; William F. Jones; Frank & Debbie Jones Farm;

Debbie Jones; Mary Tallent; Becky Tallent; James Tallent; Franklin Tallent; James

H. Freese; Crossroads Farm; Mike Burkett; M & C Farms; Ruth E. Smith, Kathy

Ann Hughes; Charles A. Clayton, Susan Clayton; J.R. Foot, Jr., Alice R. Foot;

Benjamin Foot; Foot Farms, LLC; R &F Farms, LLC; Kenneth W. Foot; JBK Farms, Inc.; Rita Foot; Verser Farms, Inc.; Joe Verser; Joe Mencer; Joe Mencer Farm; Charles Mencer Farm; WLMCO, Inc.; M&W Planting Company, Inc.; and B&B Mencer Farm; are residents of the State of Arkansas and/or business entities doing business in the State of Arkansas. All of the aforesaid Plaintiffs are residents and citizens of the State of Arkansas. **(For the citizenship information relating to the Defendants, see paragraphs 9-15 below).**

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391. A substantial portion of the events or omissions giving rise to the claim occurred in this District and alien Defendants may be sued in any district. Venue in this District is proper as to all Plaintiffs pursuant to Fed. R. Civ. P. 20, because the Plaintiffs assert a right of relief against the Defendants jointly, severally and arising out of the same transactions and occurrences and a substantial number of questions of law or material fact common to all Plaintiffs will arise in the action and predominate over individualized issues pertaining to each plaintiff. This action can be maintained more efficiently and economically for all parties than if prosecuted separately. The interest of justice supports the joinder of the parties as plaintiffs in one action. Jurisdiction is proper in this Court based on the diversity of citizenship of the parties and the amount in controversy exceeds $75,000.

## FACTS

3.     Rice sales generate approximately $2 billion in revenue for American rice producers each year.  Approximately 50% of rice grown in the United States is exported.

4.     Because about half of the rice grown in the U.S. is exported, which makes the U.S. one of the world's major rice exporters, the global rice market has a major influence on U.S. prices for rice.

5.     About 75% of the rice grown in the U.S. is "long-grain rice," and most of the production of long-grain rice is exported.  Arkansas produces more long-grain rice than any other state.

6.     The nations of the European Union (EU) are major buyers of American long-grain rice. In 2005, the EU purchased about 200,000 tons of American long-grain rice at a price of about $800 million.

7.     During 2006, about 1.3 million acres in Arkansas were planted with long-grain rice, which was about 60% of the total U.S. long-grain rice acreage. More than one-third of the U.S. long-grain acreage in 2006 was planted with strains of long-grain rice known as "Cheniere" and "Clearfield 131" ("CL131").

8.     The U.S. rice marketing system is "commodity-based," which means that rice grown throughout the country is harvested, gathered, commingled,

consolidated, and otherwise shipped from thousands of farms where it is grown via local, regional, and terminal distribution centers. Therefore, to maintain the purity and stability of the rice marketing system in the U.S., it is crucial for all involved to maintain the highest possible standards of hygiene and purity so as to avoid any kind of contamination. Prior to 2006, the U.S. rice market was stable and had not suffered any significant compromise of its purity and integrity.

9.     Bayer CropScience LP is a Delaware limited partnership with its principal place of business at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina, 27709. Bayer CropScience LP is a successor, by name change to Aventis CropScience USA, LP – which occurred when Bayer AG, Bayer CropScience LP's parent company, acquired Aventis CropScience USA, LP in or about June 2002. Bayer CropScience, LP, itself and through its parent, subsidiary, affiliated and predecessor entities – including all of the defendants listed herein- produces or has produced genetically modified and bio-engineered rice seed, including but not limited to LLRICE 601, 604 and 62. Bayer CropScience, LP is engaged in business in the State of Arkansas and is registered to do business in the State of Arkansas as a foreign limited partnership. Its registered agent in the State of Arkansas is Corporation Service Company, 300 South Spring Street, Suite 900, Little Rock, Arkansas 72201.

10.     Bayer CropScience LP's general partner is currently Bayer CropScience Holding Inc., a Delaware corporation with its principal place of business at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina, 27709. Bayer CropScience LP's general partner was Aventis CropScience USA Holding, Inc.. Bayer CropScience LP's limited partners are currently Bayer CropScience, Inc., a New York corporation with its principal place of business in Research Triangle Park, North Carolina and Bayer CropScience, LLC a Delaware limited liability company with its principal place of business in Research Triangle Park, North Carolina. Bayer CropScience Holding Inc. is engaged in business in the State of Arkansas and is registered to do business in the State of Arkansas as a foreign corporation. Its registered agent in the State of Arkansas is Corporation Service Company, 300 Spring Building, Suite 900, 300 South Spring Street, Little Rock, Arkansas 72201. Under applicable Arkansas and Delaware law, as a general partner of a limited partnership, it is jointly and severally liable for all obligations of Bayer CropScience LP.

11.     Bayer CropScience, LLC is a Delaware limited liability company with its principal place of business in Research Triangle Park, North Carolina. Bayer CropScience LLC is a limited partner to Bayer CropScience LP. Bayer CropScience, LLC's registered agent is Corporation Service Company, 2711

Centerville Road, Suite 400, Wilmington, Delaware, 19808. Through its affiliates, and partners, Bayer CropScience, LLC conducts business in the State of Arkansas and otherwise has a presence in the State sufficient to constitute minimum contacts in order to meet the due process requirements for personal jurisdiction.

12.    Bayer CropScience AG is a German corporation with its principal place of business in Germany. It, by itself and through its subsidiaries and affiliates over which it exerts substantial control, engages in research, manufacture, testing, marketing and sale of agricultural chemicals and technology, including the production of genetically modified and bio-engineered rice seed, including but not limited to LLRICE 601, 604, and 62. Bayer CropScience AG is the successor, by merger, to Bayer CropScience GmbH. As a result of such merger, Bayer CropScience AG has succeeded to and assumed all debts, commitments and liabilities of Bayer CropScience GmbH. Through its affiliates and subsidiaries, Bayer CropScience AG conducts business in the United States and the State of Arkansas and otherwise has a presence in the statute sufficient to constitute minimum contacts in order to meet the due process requirements for personal jurisdiction.

13.    Bayer AG is a German corporation, with its principal place of business in Germany. which, through its subsidiaries and affiliates over which it

exerts substantial control, engages in, among other things, the research, manufacture, testing, marketing and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here. Through its affiliates and subsidiaries, Bayer AG conducts business in the United States and in the State of Arkansas and otherwise has a presence in the State sufficient to constitute minimum contacts in order to meet the due process requirements for personal jurisdiction.

14.    Bayer BioScience NV is a Belgian corporation with its principal place of business in Gent, Belgium. Bayer BioScience NV is the Bayer entity whose scientists genetically engineered the rice. Through its affiliates and subsidiaries, Bayer BioScience NV conducts business in the United States and in the State of Arkansas and otherwise has a presence in the State sufficient to constitute minimum contacts in order to meet the due process requirements for personal jurisdiction.

15.    At all times relevant to this action, there has existed and presently exists, a unity of interests in ownership between Bayer CropScience LP, Bayer CropScience Holding, Inc., Bayer CropScience, LLC, Bayer CropScience AG; Bayer AG and Bayer BioScience NV. These defendants are the alter-egos of one another, an in the case of the parent corporation, exercised dominion and control

over the decision making and operation of their subsidiaries.  Alternatively, they have acted as and constitute a single business enterprise and/or constitute a joint enterprise under Arkansas law.

16.    Bayer CropScience LP, Bayer CropScience Holding Inc., Bayer CropScience, LLC, Bayer CropScience AG; Bayer AG and Bayer BioScience NV are hereinafter referred to collectively as "Bayer" or " the Bayer defendants".

17.    The Bayer defendants actively conduct business in the State of Arkansas and intentionally avail themselves of the markets and business within this State through the manufacturing, production, promotion, sale, marketing and distribution of their products in the State of Arkansas, including the conducting of testing of genetically modified rice in Arkansas, with said rice having infiltrated the Arkansas commercial rice supply.  These contracts are sufficient to create personal jurisdiction against the Bayer defendants.  Bayer CropScience LP, and Bayer CropScience Holding, Inc. have also consented to personal jurisdiction in the State of Arkansas by registering to do business and designating an agent for service of process in this State.

18.    The "Bayer defendants", and other companies have in recent years experimented with strains of "genetically engineered" (GE) crops, including rice. Modern biotechnology has made it possible to alter the genetic composition of

13

seed, e.g., by transferring a transgenic "event" into the seed genome, so as to confer a desired characteristic or trait onto the GE seed and crop. For example, a strain of rice can be genetically modified to make it immune to a certain type of poison or herbicide. Most of the foreign countries that buy rice and food crops from the U.S. will not accept GE crops. For example, the European Union ("EU") will not accept GE or GE-contaminated rice from the U.S.

19.    In the 1990s, companies (later acquired by the Bayer defendants) began to experiment with strains of GE rice in the U.S. known generally as "Liberty Link" rice. The names of the "Liberty Link" strains usually begin with "LL," for "Liberty Link." Those strains of Liberty Link rice go by names such as LLRICE 601, LL601, etc. Plaintiffs allege that LLRICE 62, LL62, LLRICE 401, LL401, LL001, Event 62, and Bengal Event 62 all reference the same strain of medium-grain Liberty Link GE rice.

20.    These strains of Liberty Link GE rice were developed in the late 1990s by a company known as AgrEvo USA Company. AgrEvo and Liberty Link rice were acquired by Aventis CropScience USA LP, which, around 2002, was itself acquired or merged into Bayer CropScience LP. Bayer CropScience LP has produced the "Liberty Link" GE rice seeds or the seed traits at issue here.

21.    The Bayer defendants invented, developed, tested, and produced

genetically-engineered ("GE") varieties of long-grain rice, two of which are known as LLRICE 601 (a/k/a LL601) and LLRICE 604 (a/k/a LL604). The Bayer defendants invented, developed, tested, and/or produced a genetically-engineered ("GE") variety of medium-grain rice known as LLRICE 62 (a/k/a LL62).

22.    LLRICE 604, for example, is not approved for human consumption. LLRICE 601 was not approved at the time of the USDA GMO contamination announcement in 2006

23.    LLRICE 601, 604, and 62 and other GE rice are not permitted in the European Union ("EU") and American-grown rice contaminated with GE rice cannot be exported from the USA to EU countries.

24.    The Bayer defendants know (and knew prior to 2006) that most of the long-grain rice grown in the USA is grown for export, and that the majority of American-grown long-grain rice is produced in Arkansas.

25.    The Bayer defendants know (and knew prior to 2006) that EU countries and many other countries will not import rice that is contaminated with GE rice.

26.    The Bayer defendants know (and knew prior to 2006) that contamination of the USA rice supply by Liberty Link GE rice would depress the export market and depress the market price of American-grown long-grain rice.

27.    The Bayer defendants know (and knew prior to 2006) that public knowledge of the presence of Liberty Link or other GE rice in the nation's rice supply would significantly affect the market and market price for American-grown long-grain rice.

28.    The Bayer defendants knew prior to 2006 that all varieties of Liberty Link GE rice (including LL62/601/604) were experimental only and should not have been allowed to get into the commercial rice supplies in the USA.

29.    The Bayer defendants knew prior to 2006 that a GE contamination (e.g., by Liberty Link rice) of the commercial rice supplies in the USA would damage the plaintiffs, because it would prevent or impede the sale of American long-grain rice to many foreign markets which prohibit genetically-engineered foods, including rice.

30.    Under a coordinated regulatory framework, the United States Department of Agriculture's Animal and Plant Health Inspection Service, the United States Food and Drug Administration, and the United States Environmental Protection Agency share responsibility for regulatory biotechnology products, such as Liberty Link rice, to ensure that products developed in the U.S. pose no human or environmental risks.

31.    As part of the 1999/2000 agreement(s) with Aventis, Riceland Foods,

Inc., assisted in procuring some Arkansas rice producers to plant, in 2000, certain acres with LL62 GE rice.

32.    Aventis (later acquired by the Bayer defendants) began genetic manipulation of rice resulting in the production of an enzyme which renders glufosinate-ammonium (the active ingredient in Liberty Herbicide) ineffective by catalyzing its conversion to a metabolite which is not toxic to the plant. The transformed seed is known commercially as Liberty Link rice.

33.    Some of the LL62 rice harvested in 2000 in Arkansas was initially grown and stored in Riceland's facility in Weiner, Arkansas. Upon information and belief, it appears that some of the LL62 harvest was also stored elsewhere in Arkansas.

34.    Riceland Foods, Inc. transported by truck the LL62 2000 Arkansas harvest to Stuttgart, Arkansas, for burning believed to be done in its Stuttgart incinerator.

35.    During all times relevant to this Complaint, including the years of 2000 and 2001, The Bayer defendants knew that non-GE rice could become contaminated with Liberty Link rice, including LL62/601/604, through a wide variety of means, including cross-pollination and commingling during harvest, storage, transport, and disposal.

36.    The Bayer defendants also understood that it was (and is) virtually impossible to prevent non-GE rice from becoming contaminated by GE-rice, grown in an open field, because it is practically impossible to completely isolate the growing, harvesting, storage, transportation, and disposal of GE rice from the ordinary, non-GE general rice supply.

37.    Given the nature of the "commodity-based" rice marketing system in the U.S., the Bayer defendants knew that GE rice could easily contaminate the entire U.S. rice crop and infiltrate the general U.S. rice supply, and that such contamination would result in devastating financial losses to U. S. long-grain rice producers, because their GE-contaminated rice would not have a market in the EU, Japan, and other countries opposed to GE rice.

38.    In late 2005, Riceland (a farmer owned rice marketing cooperative) shipped a shipment of U.S. long-grain rice to Europe.    In January 2006, the European buyer reported to Riceland that the shipment tested positive for traces of GE rice.

39.    Riceland and Bayer testing in early 2006, confirmed traces of Liberty Link rice in the Riceland shipment of long-grain rice.

40.    In January and February 2006, Bayer received information from Timothy Peter Croughan of the LSU Crowley Research Station, indicating to

Bayer that long grain rice had been contaminated with Liberty Link.

41.    Bayer tested and confirmed the contamination of the Croughan rice. However, in March of 2006 Bayer intentionally stopped testing so as not to confirm the specific trait LL601, because LL601 was a regulated event and Bayer knew that if the Rice tested positive for LL601 it would have to report the contamination to the USDA within twenty four hours.

42.    In February through June 2006, further testing of the Riceland shipment of long-grain rice showed contamination for Liberty Link rice.

43.    Despite knowledge by Bayer of GE contamination in the rice supply, the U.S. Government was not notified of this contamination until July 31, 2006.

44.    On August 18, 2006, the U.S. government officially announced that traces of GE rice had been found in the 2005 U.S. long-grain rice crop. Specifically, the USDA announced that Bayer CropScience had notified the USDA and the FDA that trace amounts of LL601 had been detected in samples taken from commercial long-grain rice.

45.    On September 11, 2006, Reuters reported that LL601 had found its way into the EU's retail food sector.  A CEO of a German mill suspected to have sold the contaminated rice reportedly stated that this problem was not unique to his mill but, rather, was a problem affecting every rice mill in Europe which has

imported U.S. rice.

46.    On September 14, 2006, Deutsche Welle updated its earlier reports that the European Commission had confirmed that EU imports of long-grain U.S. rice contained traces of LL601, some of which made it on to shelves of a German supermarket chain. All consignments that tested positive were recalled or withheld from the market. The same article also reported that France and Sweden had found LL601 in imported U.S. rice.

47.    On September 12, 2006, the Associated Press reported that tests by the European Commission on three barges containing rice from the United States had revealed the shipments to contain LLRICE 601. EU officials stated that consignments found to contain illegal strains either were being destroyed or returned to the United States.

48.    The Bayer defendants' contamination of the U.S. rice supply was not limited to that caused by its LL601 GE rice. In early 2007, it was disclosed that the Bayer defendants had further contaminated the U.S. rice seed supply with its LL604 GE rice. Independent testing by the Arkansas State Plant Board in January 2007 indicated that CL 131 rice seed - a non-GE rice seed created and marketed by BASF and designed to combat "red rice" weed problems - tested positive for contamination by an unapproved GE rice seed trait. Bayer's LL604 GE seed trait

20

was later disclosed as the source of that contamination. This discovery led to the USDA's ban on the planting of CL 131 in the 2007 and 2008 crop years and its further prohibition on the sale or use of CL 131 seeds held from the 2005 and 2006 crop years.

49.    As a result of the Bayer defendants' and Riceland's conduct, two of the most heavily used and highest yielding rice seed varieties in the U.S. - Cheniere and CL 131 - have been contaminated by Liberty Link GE rice and were banned from planting in, at least, the 2007 and 2008 crop years.

50.    In September 2006, LL601 was found in the seed of Cheniere rice, a popular and high-yielding long-grain variety planted throughout the southern United States. In November 2006 - approximately three months after the public disclosure of Bayer's contamination of the U.S. rice supply with LL601 - the Arkansas State Plant Board unanimously recommended that the State of Arkansas ban the planting of Cheniere rice in 2007. Soon thereafter, on December 28, 2006, the Arkansas State Plant Board passed new regulations that ban the planting of Cheniere rice in the state in 2007 and 2008, and require testing of all seed for the LLRICE trait at the 0.01% level (i.e., one grain out of every 10,000).

51.    Following the Arkansas State Plant Board's CL131 contamination findings, the Animal and Plant Health Inspection Service of the USDA ("APHIS")

conducted its own tests on CL131 and, in or about early March 2007, confirmed that trace levels of GE material were present in CL131 rice seed.  On March 2, 2007, the Arkansas State Plant Board banned the planting of CL131 rice seed in the State.

52.    In October and/or November 2006, more tests conducted in Europe on U.S. long-grain rice specifically found LL62 contamination in the U.S. long-grain rice supply.

53.    Testing in January 2007 by the Arkansas Rice Board, and shortly thereafter by the federal government, disclosed LL62 contamination in 2004 headrow seed of non-GE Clearfield 131 (CL131) long-grain rice.   Similarly, testing in late 2006 and/or early 2007 on a 2003 Cheniere variety of non-GE long-grain rice showed contamination by LL62 as well as LL601.

54.    The Bayer defendants grew test fields of LL601 rice in 1998, 1999, 2000, and 2001.   LL601 rice was first  tested in greenhouse and field tests by Hoechst AG, the parent company of AgrEvo USA Company (Aventis's corporate predecessor), in Puerto Rico under USDA permits.   Additional field testing of LL601 rice was conducted by Aventis in Puerto Rico, Arkansas, Louisiana, Mississippi, and Texas in 1998, 1999, 2000, and 2001.  Following its acquisition of Aventis CropScience in or about 2001/2002, the Bayer defendants continued to test

and develop these genetically-modified rice traits. As the owner of, and applicant for (either originally or as Aventis's successor), these GE rice traits, the Bayer defendants bore responsibility for their development, testing, handling, and use. The Bayer defendants' duties were non-delegable.

55.    LL62, for example, as well as all GE rice is banned in EU countries.

56.    The Bayer defendants know (and knew prior to 2006) that the fact of the presence of Liberty Link or any other GE rice in the nation's general rice supply is a fact that would be of material and significant importance to all rice farmers, especially those planting or contemplating planting long-grain rice varieties.

57.    As early as the latter half of 2005, the Bayer defendants knew that some rice in the nation's general rice supply was infected or contaminated with Liberty Link rice.

58.    This contamination was a fact of material importance to rice farmers.

59.    The Bayer defendants suppressed this information and did not disclose it, prior to August 2006, to any rice grower.

60.    From the latter half of 2005 through July of 2006, the Bayer defendants gained additional and more detailed information about the Liberty Link contamination of the nation's rice supply. Yet, the Bayer Defendant never gave

this material information to rice farmers prior to August 2006.

61. Bayer knew that all, most, or many American and Arkansas rice farmers would have had reservations about planting long-grain rice in the spring of 2006, if they had known, prior to planting, what Bayer knew about the GE contamination. Or, had the farmers known, they would have had their seed tested prior to planting for GE contamination. If the testing was positive, the farmers would have sought seed that was not contaminated and planted non-contaminated seed. Further, had the farmers known about the contamination, they could have planned to identity preserve their crop, test and segregate the non-contaminated rice from the contaminated rice so that the EU and other non-GE nations could be supplied with certified GE free rice. Many farmers have the ability to store and segregate their rice on-site at their own farm.

62. The Bayer defendants knew that rice farmers, including the plaintiffs, did not know, prior to planting in 2006, about the GE contamination, and Bayer knew that rice farmers and the plaintiffs did not have the same or similar ability to obtain the information about GE contamination compared to Bayer's ability and resources. Thus, the Bayer defendants were in a position of superior knowledge to the plaintiffs.

63. The Bayer defendants knew that rice growers like the plaintiffs were

24

planting long-grain rice in 2006 in reliance of there being no evidence of any genetically-engineered variety of rice contaminating the nation's general rice supply.

64.    The Bayer defendants knew that, if they disclosed what they knew about GE contamination when they knew it, the plaintiffs may not have planted GE contaminated long-grain rice in 2006. Or the plaintiffs would have had their seed tested for GE contamination prior to planting. Further, had the farmers known about the contamination, they could have planted non-contaminated seed and/or planned to identity preserve their crop, test and segregate the non-contaminated rice from the contaminated rice so that the EU and other non-GE nations could be supplied with certified GE free rice. Many farmers have the ability to store and segregate their rice on-site at their own farm.

65.    Until late July and August 2006, Bayer did not disclose to rice farmers, the public, or appropriate governmental agencies what they knew about GE contamination of the American long-grain rice supply. Specifically, Bayer did not disclose that it had received contamination information from Timothy Croughan and that Bayer's testing pointed to Liberty Link rice and LL601.

66.    After August 18, 2006, the global market for U.S. long-grain rice collapsed. For example, Japan banned the import of American long-grain rice on

August 20, 2006. On August 23, 2006, the EU announced that it would not accept American long-grain rice unless the shipment had been extensively tested and certified to be GE-free.

67.    The result of Bayer's conduct, culminating in the August 2006 announcement of GE contamination, was that 2006 exports of U.S. long-grain rice fell about 50% or about 570,000 metric tons from 2005 levels. The price that Arkansas and American long-grain rice producers could get for their 2006 crop also fell significantly. The news of the GE contamination severely restricted and depressed the market for 2006 Arkansas-grown and USA-grown long-grain rice, resulting in a significant price drop. The European market and other foreign markets for U.S. long grain rice suffered for many years, have still not recovered to this day, and may not ever fully recover as Thailand and other foreign suppliers used the contamination as an opportunity to move in and supply the EU and other countries with rice.

68.    The Bayer defendants, e.g., in 2000 and 2001, knew that foreign buyers in places like Japan and the EU had a zero tolerance for any genetically-modified crops, including rice. Thus, the Bayer defendants knew that any contamination of the U.S. rice supply by GE rice would devastate the export market for U.S.-grown long-grain rice.

69.    The general U.S. long-grain rice crop of 2006 was significantly contaminated by Bayer's GE Liberty Link rice, including LL62, LL601, and LL604, such as to drastically depress the market for and price of the U.S. 2006 long-grain rice crop.

70.    In 2000 and 2001, the Bayer defendants failed to take adequate steps to prevent cross-pollination and co-mingling of LL62 rice with non-GE rice. Additionally or alternatively, the Bayer defendants knew or should have known that no degree of precautions could have prevented such cross-pollination.

71.    The Bayer defendants failed to take adequate steps to prevent cross-pollination and/or commingling of LL62/601/604 rice with non-GE rice. Additionally or alternatively, the Bayer defendants knew or should have known that no degree of precautions could have prevented such cross-pollination and/or commingling.

72.    The Bayer defendants failed of take adequate precautions to segregate LL62/601/604 rice and prevent the contamination of the general, non-GE rice supply during the Bayer defendants' participation in the testing, planting, growing, harvesting, handling, storage, transportation, and disposal of Liberty Link rice. Additionally or alternatively, the Bayer defendants knew or should have known that no degree of precautions could have prevented such contamination and

commingling.

73.    In the testing, planting, growing, harvesting, storing, transporting, and disposal of LL62 rice, the Bayer defendants (then known as Aventis) failed to comply with their 1999/2000 contract(s) or agreement(s) and failed to comply with reasonable and responsible practices.  The Bayer defendants failed to implement adequate safeguards to prevent the release of LL62 into the general rice supply (or, the Bayer defendants should have known that no degree of reasonable safeguards could have prevented the GE contamination of the general rice supply).

74.    The Bayer defendants failed to adequately instruct, oversee, or control the 2000 Arkansas test growers of LL62 rice such as to insure complete segregation of LL62 rice from non-GE rice.

75.    The Bayer defendants' course of conduct caused the GE contamination of the 2006 Arkansas and U.S. long-grain rice crop as well as the 2007 and 2008 crops.

## DAMAGES

76.    Plaintiffs were unable to sell their 2006 crop of long-grain rice at the higher (normal) price it would have brought but for the GE contamination. Plaintiffs were also damaged by having to pay for testing to insure their long-grain rice crop is free of GE contamination, e.g., in order to be able to market and sell it

for export.  Plaintiffs were also damaged by their inability to plant high yielding herbicide resistant CL131 and/or Chenier rice seed in years 2007 and 2008. Plaintiffs were required to plant lower yielding varieties resulting in lower yields and less money. Further, having to plant less herbicide resistant varieties resulted in greater amounts of red rice in their crop.  The Plaintiffs continue to suffer a lower price for their rice than they would have received absent the GMO contamination and Plaintiffs were otherwise injured and damaged.

77.    All of the aforesaid damages were proximately caused by the conduct of the Bayer defendants.

## COUNT ONE-NEGLIGENCE
## ALL PLAINTIFFS AGAINST THE BAYER DEFENDANTS -
## ALL LIBERTY LINK RICE VARITIES

78.    Plaintiffs incorporate by reference paragraphs 1-77.

79.    The Bayer defendants were negligent in allowing the experimental LL601, 604, and 62 GE rice to escape into the nation's general rice supply.  Their negligence foreseeably and proximately caused economic damage to plaintiffs by driving down the market price for long-grain rice and causing the ban on planting high yielding herbicide resistant CL 131 and Chenier seed in crop years 2007 and 2008.

80.    The Bayer defendants were negligent in selecting, training,

instructing, or overseeing those rice producers in Arkansas who were selected to grow LL62 rice in 2000. The Bayer defendants were negligent in its testing, planting, growing, harvesting, storage, transportation, and disposal of LL62 rice in 2000-2001. The Bayer defendants failed to utilize the professional expertise and degree of care that a prudent, similarly-situated company would have exercised or acted in total disregard for the safety from contamination.

81. The Defendants owed a duty to the plaintiffs pursuant to 7 C.F.R. 340 et. seq. as well as Ark. Code § 2-15-101. Defendants were also in a position of superior knowledge to the plaintiffs.

82. The doctrine of *res ipsa loquitur* also applies to this case because the Bayer defendants had exclusive control over LL601, 604, and 62 GE rice and, in the ordinary course of things, such a highly-contagious, damaging (at least economically damaging) substance would not escape its controlled, experimental confines but for the lack of proper care.

83. Defendants, with their knowledge of the severe harm that would occur to the plaintiffs if the commercial rice supply was contaminated with Liberty Link rice, negligently failed to plan and/or implement a rice testing, identity preservation and segregation plan so that rice contaminated with Liberty Link rice could be segregated from non-contaminated rice, tested and certified so that the

European and other non-GE markets could be preserved.

84.    WHEREFORE, Plaintiffs demand from the Bayer defendants compensatory damages in an amount to be determined by the jury for each plaintiff, plus interest and costs (and punitive damages - see Count Five, *infra*) in an amount to be determined by the trier of fact.

## COUNT TWO - FRAUDULENT CONCEALMENT
## AGAINST THE BAYER DEFENDANTS

85.    Plaintiffs incorporate by reference paragraphs 1-84.

86.    Bayer's non-disclosure of what it knew about GE rice contamination as soon as Bayer knew it, is actionable fraud, because Bayer owed a duty to speak based on its superior knowledge of conditions and the harm those conditions would cause to the plaintiffs.  Bayer also had to a duty to speak based upon federal statutes regarding GE rice contamination and its obligation to report regulated GE contamination to the USDA within twenty four hours.

87.    Bayer had superior knowledge about GE contamination and knew that the plaintiffs (e.g., in choosing to plant long-grain rice in 2006, and plant said rice without GE testing) were operating under a mistaken belief that no genetically-engineered variety contamination existed, and Bayer knew that the plaintiffs did not have access to the knowledge Bayer possessed about Liberty Link and GE contamination.

88.    Bayer's failure to immediately and promptly disclose proximately caused economic damage to the plaintiffs as aforesaid.

89.    WHEREFORE, the plaintiffs demand of the Bayer defendants., compensatory damages in an amount to be determined by the jury for each plaintiff, plus interest and costs (and punitive damages - see Count Five, *infra*) in an amount to be determined by the trier of fact.

## COUNT THREE - PUNITIVE DAMAGES
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

90.    Plaintiffs incorporate by reference paragraphs 1-89.

91.    Defendants knew or ought to have known that their conduct alleged herein would naturally and probably result in the damages to the plaintiffs alleged herein, but defendants engaged in that conduct, anyway, with malice or in reckless disregard of the consequences, from which malice may be inferred.

92.    The Bayer defendants knew that the escape of Liberty Link GE rice into the nation's general rice supply would cause hundreds of millions of dollars of economic loss to the nation's rice growers and others in the rice industry, so the defendants' failure to design a system and/or to train and supervise its agents and employees in order to prevent the escape of Liberty Link GE rice into the nation's general rice supply, and their failure to have a plan to identity preserve, test and segregate the supply despite such a high likelihood of contamination, is conduct

evidencing "malice" and/or "reckless disregard," within the meaning of Arkansas Code § 16-55-206(1). The defendants' failure to confine Liberty Link GE rice was wanton and in conscious disregard to its consequences.

93.     The Bayer defendants' conduct in non-disclosure of what they knew about GE contamination, prior to August of 2006, of the general rice supply is conduct evidencing "malice" and/or "reckless disregard," within the meaning of Arkansas Code § 16-55-206(1). The failure to disclose was wanton and in conscious disregard to its consequences.

94.     WHEREFORE, in addition to the compensatory damages pleaded above, Plaintiffs demand punitive damages against Defendants pursuant to Arkansas Code § 16-55-206, in an amount to be determined by the trier of fact.

## COUNT FOUR - STATUTORY NEGLIGENCE
## ALL PLAINTIFFS AGAINST ALL DEFENDANTS

95.     Plaintiffs incorporate by reference paragraph 1-94.

96.     Defendants' conduct alleged herein, violated Arkansas Code

§ 2-15-101, which provides:

§2-15-101.  Arkansas crop and research facilities protection

(a) This section shall be known and may be cited as the "Arkansas Crop and Research Facilities Protection Act".
(b)(1) Any person or entity who willfully and knowingly damages or destroys any field crop product that is grown for personal or commercial purposes or for testing or research purposes in the context

of a product development program in conjunction or coordination with a private research facility or a university or any federal, state, or local government agency shall be liable for twice the value of the crop damaged or destroyed.

(2) In awarding damages under this section, the courts shall consider:

(A) The market value of the crop prior to damage or destruction; and

(B) Production, research, testing, replacement, and crop development costs directly related to the crop that has been damaged or destroyed as part of the value of the crop.

(3) Damages available under this section shall be limited to:

(A) Twice the market value of the crop prior to damage or destruction; plus

(B) Twice the actual damages involving production, research, testing, replacement, and crop development costs directly related to the crop that has been damaged or destroyed.

(c) This section shall not apply to any persons or entities when performing construction, land improvements, or excavation work in or upon any public right-of-way, public easement, or utility easement or who in good faith believe they are in or upon the right-of-way or easement.

97.    Defendants had a duty not to violate § 2-15-101.

98.    Plaintiffs are persons intended to be protected and benefited by

§ 2-15-101, and their damages pleaded herein are the type of damages intended to

be prevented by the statute.    The violation of § 2-15-101 by Defendants

proximately caused the plaintiffs' damages complained of herein.

99.    Title 7 ("Agriculture"), Chapter III ("Animal and Plant Health

Inspection Service, Department of Agriculture"), Part 340 of the Code of Federal

Regulations is entitled, "Introduction of Organisms and Products Altered or

Produced Through Genetic Engineering Which Are Plant Pests or Which There Is

Reason to Believe Are Plant Pests."  Defendants' conduct with regard to Liberty

Link (e.g., LL62/601/604) rice was governed by Part 340.

100.   Defendants had a duty not to violate Part 340, but defendants' conduct

alleged herein does violate Part 340, and such violations proximately caused the

plaintiffs' damages alleged herein, and plaintiffs are persons intended to be

protected from these types of harms by Part 340.

101.   Defendants' conduct violated 7 C.F.R. § 340.3(c), which provides:

(c) Performance standards for introductions under the notification
procedure. The following performance standards must be met for any
introductions under the notification procedure.
(1) If the plants or plant materials are shipped, they must be shipped in
such a way that the viable plant material is unlikely to be disseminated
while in transit and must be maintained at the destination facility in
such a way that there is no release into the environment.
(2) When the introduction is an environmental release, the regulated
article must be planted in such a way that they are not inadvertently
mixed with non-regulated plant materials of any species which are not
part of the environmental release.
(3) The plants and plant parts must be maintained in such a way that
the identity of all material is known while it is in use, and the plant
parts must be contained or devitalized when no longer in use.
(4) There must be no viable vector agent associated with the regulated
article.
(5) The field trial must be conducted such that:
(i) The regulated article will not persist in the environment, and
(ii) No offspring can be produced that could persist in the
environment.
(6) Upon termination of the field test:
(i) No viable material shall remain which is likely to volunteer in
subsequent seasons, or
(ii) Volunteers shall be managed to prevent persistence in the

environment.

102.   Violations by defendants of these applicable statutes and regulations are actionable negligence under Arkansas law.

103.   WHEREFORE, in addition to the compensatory damages pleaded in the previous Counts, Plaintiffs demand the double damages provided in Arkansas Code § 2-15-101.

### ALLEGATIONS RELATED TO THE UNCONSTITUTIONALITY OF ACT 649 ENACTED BY THE ARKANSAS GENERAL ASSEMBLY AND MORE COMMONLY REFEREED TO AS THE ARKANSAS CIVIL JUSTICE REFORM ACT OF 2003

104.   On or about March 25, 2003, Act 649 arising from the Arkansas General Assembly was enacted, and, if constitutional, became the law of Arkansas. Act 649 is entitled, "An Act to Provide Comprehensive and Uniform Civil Justice Reform; and for Other Purposes," and is subtitled, "The Civil Justice Reform Act of 2003."

105.   In Section 26 of Act 649, an Emergency Clause relating to when the Act would take effect, the legislature found that limiting the recovery of plaintiffs in certain actions for personal injury and wrongful death was necessary in order to accomplish certain legislative goals.

106.   None of the goals addressed in the Emergency Clause is a compelling state interest.

107. Act 649 was passed with the purpose and intent of decreasing the amount of recovery in certain actions for injury to person and in certain actions for wrongful death.

108. Act 649 has the effect of decreasing the amount of recovery in certain actions for injury to person and in certain actions for wrongful death.

Limitations on Joint and Several Liability

109. In actions for personal injury, medical injury, property damage, or wrongful death, Section 1 of Act 649 eliminates joint liability; Sections 3 and 5 of the Act restore joint liability in certain situations, notwithstanding the provisions of Section 1.

110. Section 2 of Act 649 requires the fact finder to consider, when assessing percentages of fault, fault of all persons who contributed to the injury, whether the person is or could have been made a party to the action.

111. Section 2 of Act 649 requires that notice of nonparty liability, asserted on any basis other than the nonparty having settled with a plaintiff, be raised by filing a pleading in the existing proceeding.

112. Section 2 of Act 649 bars the use of any finding of nonparty liability as evidence of nonparty liability.

113. Section 2 of Act 649 requires the courts of Arkansas to adjudicate the

responsibilities of parties not before the court, without the benefit of adversary presentations from the non-parties.

114.    Section 3 of Act 649 permits a plaintiff to establish and a court to find that the several share of liability of one of multiple defendants is not "reasonably collectible," and upon such finding to re-allocate the non-collectible share among remaining defendants.

115.    Section 3 of Act 649 permits the re-allocation of less that the full amount of the non-collectible share.

116.    Section 3 of Act 649 does not restore to plaintiffs the same opportunity to recover damages from tortfeasors as existed prior to the enactment of Act 649.

117.    Act 649 operates, notwithstanding Section 1, to impose joint and several liability on persons who enter into a conscious agreement to pursue a common plan or design to commit an intentional tort.

118.    Act 649 does not restore to plaintiffs the same opportunity to recover damages from tortfeasors as existed prior to the enactment of Act 649.

119.    Section 9 of Act 649 requires a plaintiff, in order to recover punitive damages, to prove liability for compensatory damages and at least one of two aggravating factors.

120.  Section 10 of Act 649 requires a plaintiff, in order to recover punitive damages, to prove the elements of Section 9 by clear and convincing evidence.

121.  Sections 9 and 10 of Act 649 alter existing standards for recovering punitive damages.

122.  Sections 9 and 10 of Act 649 increase the burden a plaintiff must bear to establish entitlement to punitive damages.

123.  Section 11 of Act 649 provides that, except in certain cases of intentional misconduct, "a punitive damages award shall not be more than "the greater of a) $250,000 or, b) three times the amount of compensatory damages, not to exceed $1,000,000, with the monetary amounts to be adjusted periodically according to the Consumer Price Index.

124.  Section 14 of Act 649 requires, upon request of any party, the court to bifurcate proceedings related to compensatory and punitive damages.

125.  Section 14 of Act 649 bars, during the compensatory phase of the bifurcated proceeding, admission of "Evidence of the financial condition of the defendant and other evidence relevant only to punitive damages."

126.  Section 14 of Act 649 bars, during the compensatory phase of the bifurcated proceeding, evidence relevant to the determination of compensation. Section 14 conflicts with rules of this Court governing the administration of trials.

127.   Act 649, in whole and in constituent parts, is not consonant with the Constitution of the State of Arkansas.

128.   Act 649, in whole and in constituent parts, on its face purposefully violates Article V Section 32, as amended by Amendment 26, of the Arkansas Constitution, which provides, in relevant part, "no law shall be enacted limiting the amount to be recovered for injuries resulting in death or for injuries to person or property."

129.   Act 649, in whole and in constituent parts, effectively violates Article V Section 32, as amended by Amendment 26, of the Arkansas Constitution.

130.   Act 649, in whole and in constituent parts, diminishes the role jurors play in assessing responsibility, compensation, deterrence, and retribution in civil cases.

131.   Act 649, in whole and in constituent parts, violates the right to jury trial guaranteed by Article II, Section 7, as amended by Amendment 16, of the Arkansas Constitution.

132.   Act 649, in whole and in constituent parts, unconstitutionally diminishes the rights of persons to serve as jurors, in violation of Article II, Sections 7 and 21 of the Arkansas Constitution.

133.   Act 649, in whole and in constituent parts, arrogates unto the

legislature functions constitutionally entrusted to jurors, who act as members of the judicial branch, in violation of Article IV, Sections 1 and 2 of the Arkansas Constitution.

134.    Act 649, in whole and in constituent parts, impermissibly limits the right of access to courts and the right to receive a remedy there, guaranteed by Article II, Sections 13 and 21.

135.    Sections 1-5 of Act 649, collectively and in constituent parts, violate Article V Section 32, as amended by Amendment 26, of the Arkansas Constitution.

136.    Sections 1-5 of Act 649, collectively and in constituent parts, violate the constitutional requirement of separation of powers, Article IV, Sections 1,2.

137.    Section 2 of Act 649 purports to vest the courts of Arkansas with authority to adjudicate disputes with non-parties, in violation of Article II, Sections 13 and 21; Article IV, Sections 1 and 2; and Article VII of the Arkansas Constitution.

138.    Section 4 of Act 649 purports to grant special immunities to one class of persons, in violation of Article II Sections 3, 13, 18, and 21 and Article V Section 25 of the Arkansas Constitution.

139.    Sections 9-14 of Act 649, collectively and in constituent parts, violate Article II, Sections 4, 7, 13, and 21; Article V Section 32, as amended by

41

Amendment 26,; and Article IV, Sections 1 and 2, of the Arkansas Constitution.

140. WHEREFORE, Plaintiffs demand from all defendants jointly and severally compensatory damages in an amount to be determined by the jury for each plaintiff, as determined by the trier of fact, plus interest and costs; and punitive damages in an amount to be determined by the trier of fact.

141. Plaintiffs demand a jury trial on all claims and issues so triable.

Respectfully submitted,

Paul Byrd
HARE, WYNN, NEWELL & NEWTON, L.L.P.
A Limited Liability Partnership
Metropolitan National Plaza
4220 North Rodney Parham Rd., Suite 250
Little Rock, Arkansas 72212
(501) 225-5500, Ark. Bar No. 85020

James J. Thompson, Jr.
Scott Powell
Don McKenna
HARE, WYNN, NEWELL & NEWTON, L.L.P.
The Massey Building
2025 Third Avenue North, Suite 800
Birmingham, Alabama 35203
(205) 328-5330

Jerry Kelly
KELLY LAW FIRM, PLLC
118 N. Center St.
P.O. Box 500
Lonoke, Arkansas 72086
(501) 676-5770, Ark. Bar No. 84085

and

R. Margaret Dobson
Dobson Law Firm
P.O. Box 459
Sheridan, AR 72150-0459
(870) 942-0820, Ark. Bar No.  99111

Attorneys for the Plaintiff

By: _____
    Paul Byrd Ark. Bar No. 85020